298 F.3d 1198
 PeTA, PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, a Virginia non-profit corporation; Sean Diener; Barry N. Platis, Plaintiffs-Appellants,
v.
Todd RASMUSSEN, Lt., Granite District Police; Lori Gardner, Principal, Eisenhower Jr. High School; Steven Ronnenkamp, Superintendent, Granite
School District; Jerry Nielson, Chief, Granite District Police; Aaron Kennard, Salt Lake County Sheriff, Defendants-Appellees.
 No. 01-4135.
 United States Court of Appeals, Tenth Circuit.
 August 7, 2002.
 
 Brian M. Barnard (James L. Harris, Jr., with him on the briefs), Utah Legal Clinic, Salt Lake City, UT, appearing for Appellants.
 Peggy E. Stone, Assistant Utah Attorney General (Mark Shurtleff, Utah Attorney General, with her on the brief), Office of the Attorney General, Salt Lake City, UT, appearing for Appellees.
 Before TACHA, Chief Judge, HENRY, and BRISCOE, Circuit Judges.
 TACHA, Chief Circuit Judge.
 
 
 1
 A police officer stopped a demonstration held by People for the Ethical Treatment of Animals ("PeTA") on a sidewalk across the street from a junior high school by threatening the protesters with arrest under Utah Code section 76-8-710. PeTA brought suit against a number of police officers and school officials under 42 U.S.C. § 1983, challenging the constitutionality of the statute on First Amendment and other grounds and seeking monetary, declaratory, and injunctive relief. The United States District Court for the District of Utah granted the defendants' motions for summary judgment, finding the statute constitutional on its face and as applied. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and DISMISS in part, REVERSE in part, and REMAND.
 
 I. Background
 
 2
 PeTA members held demonstrations for animal rights on a public sidewalk across the street from Eisenhower Junior High School ("Eisenhower") on January 6, 13, and 20, 1999. They chose to protest at this school because its flagpole displayed a flag from McDonald's, one of the school's sponsors. The school principal, Lori Gardner, had rejected PeTA's earlier request to remove the flag. On January 6, 1999, the protests lasted from noon to 1:00 p.m. About twelve protesters were present, including two who were arrested for trying to remove the McDonald's flag from the flagpole. PeTA does not challenge the defendants' response to the January 6 protest, which is the only one that occurred during school hours.
 
 
 3
 At the January 13 demonstration, which began five minutes before classes ended, about fifteen PeTA members picketed and handed out literature, leaflets, flyers, and stickers. They also collected signatures on a petition to remove the McDonald's flag. The police responded with a show of force involving a police helicopter, several police cars, and about fourteen police officers. There is no claim regarding the January 13 protest.
 
 
 4
 On January 19, the school removed the flag at McDonald's request.
 
 
 5
 Unaware of the flag's removal, five or six PeTA protesters staged a third protest on January 20. This protest also began shortly before classes ended. Five Eisenhower students staged a counter-protest representing a group they had created and called META — Meat Eaters who are Thankful for Animals. META members handed out a flyer to PeTA members and others. Before the PeTA protest began, Officer Todd Rasmussen of the Granite School District Police had researched the Utah statutes and found that section 76-8-710 prohibits disruptions to classes or students on or near school grounds. He had spoken to a Salt Lake County prosecutor, Mike Christensen, who advised him that the statute applied to PeTA's actions, as Rasmussen described them. At Eisenhower, Rasmussen obtained principal Gardner's consent, then approached PeTA members to stop the protest. He stated, "If you don't leave now, we will arrest you," and recited Utah code section 76-8-710. In response to Rasmussen's threat, the PeTA protestors left within ten minutes.
 
 
 6
 The statute upon which Rasmussen relied states:
 
 
 7
 Any person who comes into any school building or upon any school ground, or street, sidewalk, or public way adjacent to any school building or ground and whose presence or acts interfere with the peaceful conduct of the activities of any school or disrupt the school or its pupils or school activities, and who remains there, or who re-enters or comes upon the place within 72 hours, after being asked to leave by the chief administrative official of that school or his representative or agent is guilty of an offense and shall be punished as provided in Section 76-8-717.
 
 
 8
 Utah Code Ann. § 76-8-710. However, this provision is contained in Chapter 8, Part 7 of the Utah Criminal Code, which is entitled "Colleges and Universities." For purposes of Part 7, a "school" is "any private institution of higher education or any state institution of higher education." Id. § 76-8-701. The definition does not refer to a junior high school. Id. The protests were not noisy, but some students allegedly were distracted, stayed late, missed their rides, or sought to interact with the protesters. The school received a number of calls from parents and the media and made announcements to students requesting that they maintain proper behavior. In addition, about twenty students from other high schools came to Eisenhower to protest on a separate day.
 
 
 9
 On January 27, PeTA held a news conference in the same location as the earlier protests, announcing the filing of this lawsuit. Plaintiffs PeTA and members Sean Diener and Barry Platis[1] (collectively referred to as "PeTA") brought a section 1983 lawsuit against various named and unnamed members of the police department and school district officials, seeking declaratory, injunctive, and monetary relief. They alleged violations of their rights to free speech and equal protection. The defendants asserted qualified immunity as an affirmative defense.
 
 
 10
 PeTA moved for partial summary judgment, seeking a declaratory judgment that the statute is unconstitutional on its face, and the defendants filed a cross-motion for summary judgment. The United States District Court for the District of Utah found the statute constitutional on its face. PeTA then moved for partial summary judgment against defendants Rasmussen and Gardner, challenging their application of the Utah statute to PeTA. Defendants cross-moved for summary judgment on all remaining issues. The court granted defendants' motion and dismissed all remaining claims. The court did not reach the issue of qualified immunity. PeTA appeals only its First Amendment claims against Rasmussen and Gardner, which are based on the events of January 20.
 
 II. Discussion
 
 A. Standing
 
 
 11
 Although the question of plaintiffs' standing was not addressed below, standing is a jurisdictional issue, and we are obligated to raise the issue sua sponte to ensure that there is an Article III case or controversy. Essence, Inc. v. City of Federal Heights, 285 F.3d 1272, 1280 (10th Cir.2002). In response to a show cause order from this court, defendants assert on appeal that plaintiffs lack standing because the Utah statute does not apply to junior high schools.
 
 
 12
 To establish Article III standing, the plaintiff must show injury in fact, a causal relationship between the injury and the defendants' challenged acts, and a likelihood that a favorable decision will redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). PeTA, as the party invoking federal jurisdiction, bears the burden of establishing the elements of standing. Id. at 561, 112 S.Ct. 2130.
 
 
 13
 PeTA's standing for retrospective relief may be based on past injuries, whereas its claims for prospective relief require a continuing injury. Horstkoetter v. Dep't of Pub. Safety, 159 F.3d 1265, 1277 (10th Cir.1998). As the Supreme Court has explained, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). If, while the litigation is pending, an event occurs that heals the injury, plaintiffs lose their standing for claims for prospective relief[2] and the claims become moot. Horstkoetter, 159 F.3d at 1277.
 
 
 14
 PeTA suffered an injury in fact to its constitutionally protected right to free speech when the defendants threatened the protesters with arrest if they did not cease their demonstration. Defendants' actions had a causal relationship to PeTA's alleged injury, and an award of damages would redress PeTA's injury. Thus, PeTA has standing to assert its claim for retrospective relief.
 
 
 15
 PeTA does not have standing to assert its claims for prospective relief, as it does not have a "good chance of being likewise injured in the future." Facio v. Jones, 929 F.2d 541, 544 (10th Cir.1991). The defendants admit that they misinterpreted section 76-8-710, which applies only to institutions of higher education and not to junior high schools. PeTA has not indicated an intention to stage protests at institutions of higher education, nor do they allege that these defendants would be likely to enforce the statute against them if they did so. Thus, PeTA does not suffer a continuing injury, and it lacks standing to seek prospective relief. Cf. Faustin v. City and County of Denver, 268 F.3d 942, 948 (10th Cir.2001) (finding it unlikely that an ordinance would be applied to the plaintiff in the future after the city prosecutor determined that the law at issue did not apply).
 
 
 16
 Nor does PeTA have standing to challenge whether the statute is constitutional on its face. While the rules for standing are less stringent for a facial challenge to a statute, a plaintiff must still satisfy the injury-in-fact requirement. Phelps v. Hamilton, 122 F.3d 1309, 1326. The challenged statute does not apply to the protests PeTA has conducted and has expressed an intention to conduct in the future, and there is no credible threat of prosecution under the statute for any future protests at Eisenhower. Thus, there can be no claim that the statute will chill PeTA's conduct.
 
 
 17
 For these reasons, PeTA has standing only in regards to its claim that it is entitled to monetary damages because the defendants unconstitutionally applied the Utah statute to it on January 20.
 
 B. First Amendment Violation
 
 18
 We review the grant of summary judgment de novo, applying the same standard as the district court. Bryce v. Episcopal Church, 289 F.3d 648, 655 (10th Cir.2002). Summary judgment is appropriate when there is no genuine issue of material fact, viewing the evidence in the light most favorable to the nonmoving party. Id. PeTA alleges that the defendants' actions violated their First Amendment rights because the protests occurred after school hours and because there was no evidence that their conduct on January 20 was materially disruptive. Defendants respond that they properly imposed a content-neutral time, place, and manner restriction.
 
 
 19
 Content-neutral restrictions are subject to a lesser degree of scrutiny than content-based restrictions. Mesa v. White, 197 F.3d 1041, 1045 (10th Cir.1999) (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)). Government regulation of speech is content-neutral if it is "justified without reference to the content of the regulated speech." Hill v. Colorado, 530 U.S. 703, 720, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Here, Rasmussen and Gardner relied on the Utah statute, which prohibits disruptive activities adjacent to schools regardless of the content of the speech. Utah Code Ann. § 76-8-710. Although the defendants misapplied the statute to PeTA, their misapplication of the statute was unrelated to the content of PeTA's speech. The school also applied the ban to META, which expressed the opposite message from PeTA. Defendants' actions were thus content-neutral.
 
 
 20
 The scrutiny applied to content-neutral restrictions depends on whether the restrictions affect a public forum. Content-neutral speech restrictions in a public forum are subject to strict scrutiny, while content-neutral restrictions in a non-public forum are subject to a reasonableness test. United States v. Kokinda, 497 U.S. 720, 726-27, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990). Schools are not traditional public fora, and their facilities become designated public fora "only if school authorities have `by policy or practice' opened [them] for `indiscriminate use by the general public.'" Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (quoting Perry Educ. Ass'n, 460 U.S. at 47, 103 S.Ct. 948). Sidewalks, however, generally are traditional public fora. Faustin, 268 F.3d at 949. Sidewalks and streets have "immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." Kunz v. New York, 340 U.S. 290, 293, 71 S.Ct. 312, 95 L.Ed. 280 (1951) (citation omitted). Sidewalks adjacent to schools receive similar protection: "[T]he public sidewalk adjacent to school grounds may not be declared off limits for expressive activity by members of the public." Grayned v. City of Rockford, 408 U.S. 104, 118, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). PeTA's protests occurred on a sidewalk adjacent to Eisenhower, not on the school grounds themselves. Therefore, we apply the heightened First Amendment standard for public fora.
 
 
 21
 In a public forum, the government may only impose content-neutral time, place, and manner restrictions that: (a) serve a significant government interest; (b) are narrowly tailored to advance that interest; and (c) leave open ample alternative channels of communication. Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).
 
 
 22
 
 a. Significant Government Interest
 
 
 
 23
 The Supreme Court has recognized a significant government interest in preventing expressive activity that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). The Tinker Court held that wearing black armbands to school in protest of the Vietnam War did not disrupt classwork, and struck down the restriction on armbands. In Grayned, the Court found a "compelling interest in having an undisrupted school session conducive to the students' learning." 408 U.S. at 119, 92 S.Ct. 2294. The Grayned Court upheld an antinoise ordinance against a facial vagueness and over-breadth challenge, where the ordinance prohibited, while school is in session, noises or diversions that tend to disturb the peace or good order of the school. The Seventh Circuit elaborated on the government interest in undisrupted classes, stating: Government has few interests more compelling than its interest in insuring that children receive an adequate education. `The American people have always regarded education and [the] pursuit of knowledge as matters of supreme importance.' ... [E]ducation provides the basic tools by which individuals might lead economically productive lives to the benefit of us all.
 
 
 24
 Rothner v. City of Chicago, 929 F.2d 297, 303 (7th Cir.1991) (alterations in original) (quoting Plyler v. Doe, 457 U.S. 202, 221, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982)). We agree with the Seventh Circuit's reasoning, and hold that there is a significant government interest in preventing disruptions to classes or substantial disorder.
 
 
 25
 
 b. Narrowly Tailored
 
 
 
 26
 The defendants' restrictions must also be narrowly tailored to advance the government's significant interest. Grayned, 408 U.S. at 115, 92 S.Ct. 2294. PeTA argues that the government's interest in an education only justifies restrictions on speech when classes are in session and only for material disruptions. In Grayned, the Court only addressed disruptions to classes "in session,"[3] and the Court found a compelling interest in an "undisrupted school session conducive to the students' learning." 408 U.S. at 119, 92 S.Ct. 2294. The Court stated, "[n]oisy demonstrations that disrupt or are incompatible with normal school activities .... may be constitutionally protected at other places or other times ... but next to a school, while classes are in session, [they] may be prohibited." Id. at 120, 92 S.Ct. 2294 (emphasis added). Similarly, in Rothner, the Seventh Circuit upheld an ordinance prohibiting minors from playing video games before 3 p.m. because it was limited to school hours. 929 F.2d at 303. The court stressed that the ordinance was narrowly tailored to school-age students and school hours, and "prohibits the students' contacts with the video games only insofar as such conduct `disrupts ... normal school activities.'" Id. at 304 (quoting Grayned, 408 U.S. at 119, 92 S.Ct. 2294). While Grayned did not explicitly find a significant governmental interest after school hours and did not define "normal school activities," we find that disruptions immediately after school can affect the school's learning environment and that leaving school can properly be considered a "normal school activity" for a junior high school.
 
 
 27
 In Grayned, the Supreme Court allowed restrictions on material disruptions to classes but cautioned that quiet and peaceful protests must be tolerated:
 
 
 28
 We would be ignoring reality if we did not recognize that the public schools in a community are important institutions, and are often the focus of significant grievances. Without interfering with normal school activities, daytime picketing and handbilling on public grounds near a school can effectively publicize those grievances to pedestrians, school visitors, and deliverymen, as well as to teachers, administrators, and students. Some picketing to that end will be quiet and peaceful, and will in no way disturb the normal functioning of the school. For example, it would be highly unusual if the classic expressive gesture of the solitary picket disrupts anything related to the school, at least on a public sidewalk open to pedestrians. On the other hand, schools could hardly tolerate boisterous demonstrators who drown out classroom conversation, make studying impossible, block entrances, or incite children to leave the schoolhouse.
 
 
 29
 Grayned, 408 U.S. at 118-19, 92 S.Ct. 2294. Similarly, Tinker only allowed restrictions on conduct that "materially disrupts classwork or involves substantial disorder or invasion of the rights of others." 89 S.Ct. at 740.
 
 
 30
 In addition, the government's interest is limited to preventing actual or imminent disturbances, Grayned, 408 U.S. at 111-12, 92 S.Ct. 2294, not "undifferentiated fear or apprehension of disturbance." Tinker, 393 U.S. at 508, 89 S.Ct. 733. In demonstrating such a disruption, "the administration must rely on reasonable inferences drawn from concrete facts, not on the mere apprehension or speculation that disturbances or interferences with appropriate discipline will occur." Conn. State Fed'n of Teachers v. Bd. of Educ. Members, 538 F.2d 471, 478 (2d Cir.1976).
 
 
 31
 Moreover, the state may not prevent speech simply because it may elicit a hostile response. Cox v. Louisiana, 379 U.S. 559, 560, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965). In Cox, about 2,000 protesters peacefully demonstrated against segregation. The State contended that the conviction of a protester should be upheld because of the fear that violence was about to erupt because of the demonstration. Id. The Court rejected this argument, finding that the students themselves threatened no violence and that there were seventy-five to eighty armed policemen present who could have handled the crowd. Id. The Court found that persons may not be punished "merely for peacefully expressing unpopular views." Id. at 561, 85 S.Ct. 476. "[A] `function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging.'" Id. at 561-62, 85 S.Ct. 476 (quoting Terminiello v. City of Chicago, 337 U.S. 1, 4-5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949)). In Tinker, the Court warned:
 
 
 32
 Any word ... that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk.... In order for the State ... to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.
 
 
 33
 393 U.S. at 508-09, 89 S.Ct. 733.
 
 
 34
 PeTA argues that no actual or imminent material disruptions occurred on January 20, when the defendants applied the statute. Defendants, relying mainly on their own deposition testimony, assert that a number of disruptions occurred as a result of the various protests, such as students running through the building, staying late, missing rides and busses, and looking out the windows for the protesters' arrival. The protests forced school administrators to spend time on certain tasks, such as fielding a number of inquiries from parents and the media and making announcements to students to maintain proper behavior. On the other hand, most reports suggest that the protesters were quiet and orderly. There is evidence that the large police presence, including a police helicopter, was as distracting as the protests themselves.
 
 
 35
 More important, almost all of the reported disruptions occurred prior to the relevant date of January 20. Gardner testified that there was a sports activity in the gym that afternoon, but the only specific allegation of disruption to students or school activities on January 20 is Gardner's claim that students were looking out the windows of two classrooms that face the site of the protest. She does not claim that the students were distracted by the protesters' actions on January 20, but by the anticipation of their arrival. Gardner states that she was in a meeting with parents that afternoon and did not observe the PeTA protesters herself, nor is it clear from her deposition testimony that she had personal knowledge of students looking out classroom windows. Fed.R.Civ.P. 56(e) (requiring personal knowledge for testimony to be considered on a motion for summary judgment). Rasmussen states in his deposition that he did not have any knowledge — personal or second-hand — of students looking out classroom windows. Although Gardner also alleges that a group of students asked her when the city bus stop was going to be cleared so that they could wait at that stop, she does not recall whether this occurred on January 20 or 27, and PeTA presented evidence that the bus stop is 100 feet from the site of the protests.
 
 
 36
 Viewing the evidence in the light most favorable to PeTA, we find that the defendants have failed to demonstrate that there is no genuine issue of material fact as to whether the protesters' actions on January 20 caused actual or imminent material disruptions or substantial disorder. Therefore, the defendants are not entitled to summary judgment.[4]
 
 C. Qualified Immunity
 
 37
 PeTA argues that the defendants did not assert qualified immunity below and therefore cannot assert it on appeal. The record reveals that the defendants did in fact assert qualified immunity before the district court, although the district court found it unnecessary to address the issue. We now consider whether the defendants are entitled to qualified immunity.
 
 
 38
 In evaluating a claim for qualified immunity, the court must first determine whether, considered in the light most favorable to the plaintiff, the facts alleged state the violation of a constitutional right. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). If so, the court must go on to determine whether the constitutional right was clearly established at the time of injury. Id. If the answer to either of these questions is no, the defendant is entitled to qualified immunity. Id.
 
 
 39
 As our discussion above demonstrates, PeTA has alleged the violation of a constitutional right. The dispositive question is thus whether the right was clearly established at the time of the alleged violation. To meet this standard, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Tinker and Grayned clearly established the right to engage in expressive activity on a sidewalk adjacent to a school if no material disruption occurs. Therefore, the defendants are not entitled to qualified immunity.
 
 
 III. Conclusion
 
 
 40
 In sum, the defendants admit that they incorrectly applied the Utah statute to the plaintiffs. Because the statute is unlikely to be applied against the plaintiffs in the future, they do not have standing to bring a claim for prospective relief, and we cannot consider their facial challenge to the statute. The defendants have not carried their burden of demonstrating that there is no genuine issue of material fact regarding whether they violated plaintiffs' constitutional rights, because it is not clear from the evidence that the January 20 protest caused material disruption to normal school activities. Nor are the defendants entitled to qualified immunity. We therefore DISMISS the claims for prospective relief and the facial challenge to the statute, and REVERSE and REMAND to the district court for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Now deceased
 
 
 [2]
 While a declaratory judgment is generally prospective relief, in some situations it has been recognized as retrospectiveF.E.R. v. Valdez, 58 F.3d 1530, 1533 (10th Cir.1995). In F.E.R., this Court found that the plaintiffs' claim for an injunction was mooted by a return of property, but their claim for declaratory relief was not moot because it was "similar to their claim for damages" and required the court "to determine whether a past constitutional violation occurred." Id. Thus, we consider declaratory relief retrospective to the extent that it is intertwined with a claim for monetary damages that requires us to declare whether a past constitutional violation occurred. In such a situation, however, declaratory relief is "superfluous in light of the damages claim." Green v. Branson, 108 F.3d 1296, 1300 (10th Cir.1997).
 
 
 [3]
 The relevant statute stated: "[N]o person, while on public or private grounds adjacent to any building in which a school or any class thereof isin session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof." Grayned, 408 U.S. at 107-08, 92 S.Ct. 2294 (emphasis added).
 
 
 [4]
 PeTA also argues that defendants' restrictions failed to leave open ample alternative channels of communication, as required of time, place, and manner restrictions on speechWard, 491 U.S. at 791, 109 S.Ct. 2746. Because Supreme Court precedent establishes that the state may prohibit material disruptions to normal school activities, we find it unnecessary to address this prong of the test. PeTA remains free to conduct protests in a manner that is not materially disruptive to normal school activities.