BYE, Circuit Judge,
concurring.
While I agree with the Court as to the ultimate outcome of this case, I write separately because the Union Mall, Peace Fountain, and Brough Commons should be recognized as traditional public fora.
The most important analysis we undertake in a First Amendment case is the forum analysis. As the Court recognizes, the forum analysis dictates the level of scrutiny we apply in First Amendment cases. See Ark. Educ. Television Comm’n *984 v. Forbes, 523 U.S. 666, 677-83, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998). While the Court does an excellent job of wading through the muddy waters of First Amendment forum analysis jurisprudence, like so many courts, it fails to plant the seeds of its discourse in the marshes at issue here. I cannot adopt the Court’s view as to public areas on a public university campus not being traditional public fora but instead designated public fora which the University can redesignate to a non-public forum on a whim.
I
The Court employs the now-standard definition of a traditional public forum: property owned or controlled by the government which (1) has the physical characteristics of a public thoroughfare, (2) was created with the purpose of open public access or for a purpose inherently compatible with expressive conduct,[9] and (3) has traditionally been used for expressive conduct. Warren v. Fairfax County, 196 F.3d 186, 191 (4th Cir.1999). Streets, sidewalks and parks are the quintessential traditional public fora. See ante at 978 (citing United States v. Grace, 461 U.S. 171, 177, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983); Hague v. Comm. for Indus. Org., 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)); see also Am. Civil Liberties Union of Nev. v. City of Las Vegas, 333 F.3d 1092, 1099 (9th Cir.2003). Indeed, “public places historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered,* without more, to be public forums.” Ante at 975 (quoting Grace, 461 U.S. at 177, 103 S.Ct. 1702) (internal quotations omitted); see also Hague, 307 U.S. at 515, 59 S.Ct. 954 (“Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.”). However, the Court’s analysis fails to give any weight to the precedent it cites.
The Court acknowledges the areas in dispute-the Union Mall, Peace Fountain, and Brough Commons-have the “physical characteristics of streets, sidewalks, and parks, and are open for public passage.” Ante at 978. The Court even goes so far as to note “[t]he physical characteristics of these spaces, ‘without more,’ might make them traditional public fora.” Id. Of course, the physical characteristics of a space are not the only factors to consider in a traditional public forum analysis. The purpose for which the space was created and the traditional use of the space must also be considered. See Warren, 196 F.3d at 191. In analyzing the other factors, the Court missteps. It gives undue weight to largely irrelevant factors, insufficiently analyzes others, and fails to contextualize its analysis to the University of Arkansas spaces at issue.
The Court, relying upon dicta in a case dealing with spaces on the University of *985 Maryland campus, claims a public university’s mission is “not to provide a forum for all persons to talk about all topics at all times,” but rather to serve as an enclave for higher education. Ante at 978. The Court next ascribes this mission to the University of Arkansas without analyzing its varied missions or how they relate to determining the existence of a traditional public forum.[10] See ACLU of Nevada, 333 F.3d at 1104 & n. 11 (noting government intent is not relevant to a traditional public forum analysis). Despite its contention no factor is dispositive, see ante at 978 n. 6, the Court essentially concludes this mission is sufficient to outweigh all other factors.
The Court’s analysis, however, does not comport with Supreme Court precedent. The issue is not whether the mission of the University as a whole is to provide full access to everyone on all topics, but whether the University created the spaces for public access and a purpose not incompatible with expressive conduct and such spaces have historically been used for expressive conduct. The University’s overall mission is irrelevant to a proper First Amendment forum analysis.
Should the University’s mission be relevant, it would not be dispositive of whether a space is a traditional public forum. “The primary factor in determining whether property owned or controlled by the government is a public forum is how the locale is used.” Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep’t of Parks & Recreation, 311 F.3d 534, 547 (2d Cir.2002) (quoting Int’l Soc’y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth., 691 F.2d 155, 160 (3d Cir.1982)); see also Int’l Soc’y for Krishna Consciousness v. Lee, 505 U.S. 672, 693, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (Kennedy, J., concurring) (“If our public forum jurisprudence is to retain vitality, we must recognize that certain objective characteristics of Government property and its customary use by the public may control.”) (quoting United States v. Kokinda, 497 U.S. 720, 737, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (Kennedy, J., concurring)).
The Court’s analysis gives rather short shrift to another significant factor in the traditional public forum analysis: whether the space was created for a purpose incompatible with expressive conduct. The Court does not suggest how expressive conduct, occurring in the Union Mall, Peace Fountain, or Brough Commons is “basically incompatible” with a mission of promoting higher education. See Greer v. Spock, 424 U.S. 828, 843, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). Indeed, courts have consistently held expressive conduct is compatible with a purpose of promoting education. See, e.g., Keyishian v. Bd. of Regents of the Univ. of N.Y., 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) (noting the purpose of public universities is to expose students to a “marketplace of ideas”); Bd. of Regents of the Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 237, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000) (“[Recognition must be given as well to the important and substantial purposes of the University, which seeks to facilitate a wide range of speech.”); Peck v. Upshur County Bd. of Educ., 155 F.3d 274, 279 (4th Cir.1998) (affirming the district court finding the express purpose of a primary school board’s practice of allowing private speakers access to the public schools was to promote “a broad spectrum of knowl *986 edge”); N.J. Sports & Exposition Auth., 691 F.2d at 160 (“[TJhe exchange of ideas is an essential part of the educational process ....”); Glover v. Cole, 762 F.2d 1197, 1200 (4th Cir.1985) (“A college milieu is the quintessential ‘marketplace of ideas.’ ”).
In analyzing the particular spaces, it is undisputed the Union Mall, Peace Fountain, and Brough Commons are public thoroughfares open to public access. It is also undisputed these areas are used and have historically been so for expressive and non-expressive activities by both University and Non-University Entities. The Court’s analysis discounts such significant factors in favor of a lesser one-the University’s mission-which is largely irrelevant to a traditional public forum analysis.
II
The authority upon which the Court relies does not support the view streets, sidewalks, and parks on a public university are not traditional public fora. In fact, the Court’s position is tenuous at best. See Healy v. James, 408 U.S. 169, 180, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972) (“[T]he precedents of this Court leave no room for the view that, because of the acknowledged order, First Amendment protections should apply with less force on college campuses than in the community at large.”). The only appellate case the Court cites arguably on point is Hays County Guardian v. Supple, 969 F.2d 111, 118 (5th Cir.1992), which held sidewalks and plazas to be designated public fora for the speech of university students. The analysis in Hays, however, follows the test for determining whether a space is a traditional public forum. See id. at 117 (noting Southwest Texas State University’s regulations permit “[a]ny group or person, whether or not a student or employee, and whether or not invited by a registered student, faculty, or staff organization, may assemble and engage in free speech activities on the grounds of the campus”). In analyzing the spaces, however, the Fifth Circuit never addressed the traditional uses of the sidewalks and plazas or whether they might be considered traditional public fora. Accordingly, Hays does not stand for the proposition outdoor sidewalks and plazas on University property are not traditional public fora; it only stands for the proposition they are at least designated public fora.
The other cases to which the Court cites are clearly distinguishable as they relate to: (1) public high schools, which have not been traditionally held open to expressive conduct, Tinker v. Des Moines Indep. Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); see also Southworth, 529 U.S. at 237, 120 S.Ct. 1346 (Souter, J., concurring) (“[Our] cases dealing with the right of teaching institutions to limit expressive freedom of students have been confined to high schools, whose students and their schools’ relation to them are different and at least arguably distinguishable from their counterparts in college education.”) (internal citations omitted), and which face unique and significant discipline concerns, N.J. Sports & Exposition Auth., 691 F.2d at 160 (“Since the exchange of ideas is an essential part of the educational process, but the need for discipline and order is great, a public high school is probably a limited forum also.”); and (2) military bases which have not been historically held open as a public thoroughfare or for expressive conduct, Greer, 424 U.S. at 838, 96 S.Ct. 1211.
The Court also relies upon dicta found in a footnote in Widmar v. Vincent, 454 U.S. 263, 268 n. 5, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (“We have not held, for example, that a campus must make all of its facilities equally available to students and non- *987 students alike, or that a university must grant free access to all of its grounds or buildings.”), for the proposition streets, sidewalks, and parks found within public universities are not traditional public fora. This reading is not supported by the footnote. The footnote begins, “[t]his Court has recognized that the campus of a public university, at least for its students, possesses many of the characteristics of a public forum.” Id. (internal citation omitted). The footnote goes on to limit this generality when applied to college classrooms. For this limitation, the Court relies upon cases dealing with public high schools, which, as noted above, are readily distinguishable from college campuses. The Court in no way suggests, and perhaps with its use of the term “all” implies the contrary, all streets, sidewalks, and parks on a public university are non-traditional public fora.
Indeed, the Court’s reading is in tension with its position a public university campus contains a variety of fora. See Justice for All v. Faulkner, 410 F.3d 760, 766 (5th Cir.2005); Ala. Student Party v. Student Gov’t Ass’n, 867 F.2d 1344, 1354 n. 6 (11th Cir.1989) (Tjoflat, J., dissenting). If a public university contains a space which is properly considered a traditional public forum, which it almost certainly does, I cannot think of a more appropriate traditional public forum than a street, sidewalk, or park. For this reason, I disagree with Am. Civil Liberties Union v. Mote, 423 F.3d 438 (4th Cir.2005) (holding because the campus is an institution of higher learning, its outdoor areas are not held open to the general public). Mote stands for the proposition the campus as a whole, including classrooms, facilities, and buildings, must be open to the entire public for the outdoor areas to constitute a traditional public forum, even when the public has unfettered access to such outdoor areas. I emphatically disagree with Mote for the reasons described in this concurrence. See Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988) (“[High] school facilities may be deemed to be public forums only if school authorities have ‘by policy or by practice’ opened those facilities for indiscriminate use by the general public.”) (quoting Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 47, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983)); see also Faulkner, 410 F.3d at 766 (noting a public university campus may contain a variety of fora); Ala. Student Party, 867 F.2d at 1354 n. 6 (same).
Ill
The Court does acknowledge public universities and colleges have been historically and traditionally used for expressive purposes by students and non-students alike. The Court considers the outdoor areas on the University of Arkansas campus to be unlimited designated public fora, presumably to ensure student and non-student speech is protected to the level we associate with public universities. However, although the Court’s designation requires the application of the same level of scrutiny of regulations limiting speech as does a traditional public forum designation, see, e.g., Goulart v. Meadows, 345 F.3d 239, 250 (4th Cir.2003), the Court’s designation does not effectively serve to protect either student or non-student speech.
Once a space is deemed something other than a traditional public forum, even if an unlimited designated public forum, the government is free to redesignate the space to limit further expressive conduct or to prohibit it completely. See, e.g., Lee, 505 U.S. at 700, 112 S.Ct. 2701 (Kennedy, J., concurring); Perry, 460 U.S. at 46, 103 S.Ct. 948 (declaring a governmental entity *988 is not required to retain indefinitely the open character of a designated public forum); Chicago Acorn v. Metro. Pier & Exposition Auth., 150 F.3d 695, 699-700 (7th Cir.1998). This is a concept inconsistent with our basic understandings of a public university. See Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 835-36, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995) (discussing the historical use of universities as “voluntary and spontaneous assemblages or concourses for students to speak”).
To safeguard a public university street, sidewalk, or park’s role as a place for students to assemble and speak, these areas must be considered the type of property which would fall within the traditional public forum category. Whether a particular public university street, sidewalk, or park is a traditional public forum will depend upon the purpose for which it was created and its traditional use. However, there is no forum more appropriately considered a “marketplace of ideas” and historically used by all members of the public to present both socially acceptable and unacceptable speech than a street, sidewalk, or park found on a public university campus.
Indeed, there is no reason students who may or may not pay tuition and who may or may not live on campus should have more expressive rights upon a campus street than should non-students who directly support the public university with tax dollars. The non-student public attends civic, sporting, theater, and other events on public university campuses. In this sense, a public university belongs just as much to a community as it does to the students. Nor is a public university’s educational mission limited to its students-a university and its faculty publish books to benefit the public good and use public tax dollars to conduct important research. If we are to protect any space as a traditional public forum for expressive purposes, a public university street, sidewalk, or park must be such a space.
Wherever a public street or sidewalk runs, it is presumed to be a traditional public forum. Frisby v. Schultz, 487 U.S. 474, 480, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988). There is, therefore, no reason to apply a different level of scrutiny to a street, sidewalk or park which happens to fall within the boundaries of a public university than to one owned by a municipality. The location of the street “may well inform the application of the relevant test, but it does not lead to a different test.” Id.; see also Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (“The nature of a place, the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.”) (internal quotation omitted). The University of Arkansas allows indiscriminate expressive use by all members of the public at the Union Mall, Peace Fountain, and Brough Commons, regulated only by narrowly tailored time, place, and manner restrictions designed to serve significant government interests. While the university context may allow greater and different types of time, place, and manner regulations, those regulations do not change the character of the space as a traditional public forum.
IV
The Court wholly fails to acknowledge the University did not formally regulate expressive conduct on its public thoroughfares until it enacted the Policy in 1993. Because the University now chooses to regulate speech, however, may not be sufficient to overcome the objective indicia of contrary purpose. See Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir.1991).
*989 It is unclear from the record whether the spaces at issue in the instant case were designated when the University was founded in 1871 or were created sometime thereafter. If created at the time the University was founded or prior to the enactment of the Policy, this might suggest the University designated the spaces for a purpose inherently compatible with expressive conduct. See Rosenberger, 515 U.S. at 835-36, 115 S.Ct. 2510 (“[Ujniversities began as voluntary and spontaneous assemblages or concourses for students to speak and to write and to learn.”); Mote, 423 F.3d 438 (“There is nothing in the record to indicate that until the policy at issue here was implemented, the campus was anything but a non-public forum for members of the public not associated with the university.”). If created after the enactment of the Policy, it is possible the University intended a purpose not inherently compatible with expressive conduct. However, the record is conspicuously silent on this issue and, indeed, why the spaces were designated as such in the first instance.
The Court, however, does acknowledge the spaces at issue have historically and traditionally been used by University and Non-University Entities.[11] The Court further recognizes “college campuses traditionally and historically serve as places specifically designated for the free exchange of ideas.” Ante at 979. Indeed, the Court recognizes a historical and traditional use of public universities and colleges by non-students and students alike is to discuss issues of public significance during times of turmoil. The Court, however, does not suggest where this speech historically or traditionally occurred on the campuses.
I am left with uncertainty when the spaces were designated and why-factors of significant importance in determining whether the spaces were created for purposes inherently compatible with expressive conduct. In spite of the Court’s valiant effort to use generalization to establish the historical and traditional use of the Union Mall, Peace Fountain, and Brough Commons, the record remains insufficient to determine whether the spaces are traditional public fora under our adopted precedent.
However, the absence of a record should not necessarily preclude us from reaching a conclusion on the merits of a case. Grace is instructive: “ ‘[p]ublic places’ historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks, are considered, without more, to be ‘public forums.’ ” 461 U.S. at 177, 103 S.Ct. 1702. This view is buttressed by Frisby, which states, “[n]o particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora.” Frisby, 487 U.S. at 481, 108 S.Ct. 2495; see also Kokinda, 497 U.S. at 744 n. 2, 110 S.Ct. 3115 (Brennan, J., dissenting) (“[Wjhen citizens are going about their business in a place they are entitled to be, they are presumptively entitled to speak.”).
While Frisby does not stand for the proposition every sidewalk, street or park located on government property is a public forum, it does suggest a heavy burden to prove otherwise. Frisby, read in light of Grace and Kokinda, suggest there is a *990 presumption of public streets, sidewalks, and plazas being associated with expressive conduct, wherever they are located, are presumed to be traditional public fora, unless proved otherwise. While other spaces may constitute traditional public fora, see ACLU of Nev., 333 F.3d at 1099 n. 6, these are the spaces the case law presumes to be traditional public fora.
Given the sparse record in the instant case, it is incumbent upon us to determine a framework for proving whether a particular space is a traditional public forum. Given the presumption established by Grace and Frisby, we should permit a prima facie showing of a traditional public forum to be made when a plaintiff establishes the space at issue is a public street, sidewalk, or plaza associated with expressive activity. Here, Mr. Bowman has clearly done so.
When a plaintiff makes a prima facie showing a space is a traditional public forum, the defendant should bear the burden to produce objective evidence of the (1) physical characteristics, (2) original purpose, or (3) historical and traditional use of the space which would rebut plaintiffs prima facie showing.
Here, the University failed to produce evidence which would establish anything other than a traditional public forum regarding the purposes for which the Union Mall, Peace Fountain, and Brough Commons were created or regarding the historical and traditional uses of those spaces.[12] Accordingly, I would conclude the University failed to meet its burden to produce evidence sufficient to rebut Bowman’s prima facie showing the spaces at issue are traditional public fora.[13] Nevertheless, this does not end the inquiry. A determination must still be made whether the regulations comport with the standard of scrutiny applied to regulation of traditional public fora.
V
Although I disagree with the Court’s forum analysis and failure to place appropriately the burden of rebuttal on the University, I agree with the ultimate disposition of this ease because the advance notice and permit requirements, as well as the dead day restrictions, imposed by the University pass constitutional muster under the traditional public forum analysis, while the five day limitation does not.[14] *991 See Grayned, 408 U.S. at 118-19, 92 S.Ct. 2294 (noting the city can restrict the public’s expressive activity on public sidewalks adjacent to a school if the conduct “materially disrupts classwork or involves substantial disorder or invasion of the rights of others”).
Although the Court’s reasoning as to Bowman’s proposed leafleting and silent speech activities comes close to upholding improper prohibitions on speech based upon a feared reaction, see Tinker, 393 U.S. at 508-09, 89 S.Ct. 733; PeTA, People for the Ethical Treatment of Animals v. Rasmussen, 298 F.3d 1198, 1206 (10th Cir.2002) (citing Cox v. Louisiana, 379 U.S. 559, 560, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965)), given the University’s limited resources, the advance notice and permit regulations nevertheless serve significant governmental interests in protecting University Entities against unwanted solicitation and ensuring proper crowd control capabilities, while being narrowly tailored to those interests. See Glover, 762 F.2d at 1201-03 (concluding solicitation restriction is a “manner” restriction which passes constitutional muster).
Similarly, the dead day ban is a time restriction which serves a significant government interest in'ensuring proper studying and testing conditions and is narrowly tailored to those interests.[15] See PeTA, 298 F.3d at 1204-05.
Based on such reasoning as to the nature and status of the Union Mall, Peace Fountain, and Brough Commons, which, I believe, should be recognized as traditional public fora, I do, nonetheless, concur in the ultimate outcome of this case.

. While the purpose for which a space was created is important to determine whether a traditional public forum exists, government intent is not otherwise relevant to a determination of whether a space is a traditional public forum. See Am. Civil Liberties Union of Nev. v. City of Las Vegas, 333 F.3d 1092, 1104 & n. 11 (9th Cir.2003). Even under a broader intent analysis, however, the University's historical use of the spaces for expressive purposes suggests the areas were intended to be traditional public fora. See Paulsen v. County of Nassau, 925 F.2d 65, 69 (2d Cir.1991) ("Intent is not merely a matter of stated purpose. Indeed, it must be inferred from a number of objective factors, including: [the government's] policy and past practice, as well as the nature of the property and its compatibility with expressive activity.”).

. One of the University of Arkansas's purposes in enacting the Policy is the promotion of viewpoint diversity.

. While the Court uses its analysis of the historical and traditional use of the spaces to determine whether the spaces are designated public fora or non-public fora, the same analysis applies equally to determine whether the spaces are traditional public fora or non-traditional public fora.

. That the University has restricted speech for over a decade does not establish that those restrictions comport with the greater history of the spaces or their inherent compatibility with expressive purposes. Indeed, although a University may attempt to change the character of a traditional public forum, it can only do so legitimately by changing the physical characteristics of the space-it may not do so by fiat. See Lee, 505 U.S. at 700, 112 S.Ct. 2701 (Kennedy, J., concurring); Kokinda, 497 U.S. at 743, 110 S.Ct. 3115 (Brennan, J., dissenting) ("Public access is not a matter of grace by government officials but rather inherent in the open nature of the locations.”).

. The Court fails to analyze the differences between the three areas, including those related to public perception, which might counsel a different outcome for the Brough Commons than the Union Mall or the Peace Fountain. Brough Commons is unique even among the other two public places because it is located at the intersection of two public streets and is not separated from the city sidewalks and public thoroughfares by a fence or other clear demarcation. The record establishes a passerby would not know she had entered a "special enclave” with reduced protections for expressive conduct once she passed onto the Brough Commons area. See Grace, 461 U.S. at 179-80, 103 S.Ct. 1702; Initiative and Referendum Inst. v. United States Postal Serv., 417 F.3d 1299, 1313-14 (D.C.Cir.2005). Under the case law which speaks directly to this issue, Brough Commons is a traditional public forum.

.Although the same scrutiny is applied in cases involving traditional public fora and *991 designated public fora, see, e.g., Goulart, 345 F.3d at 250, I disagree with the Court's implicit suggestion there is a lessened burden for designated public fora because the University may simply redesignate the space at issue. While the University may redesignate the space if the space is deemed a designated public forum, such a redesignation cannot serve to avoid review under the designated public forum standard, nor can it be applied as a post hoc rationalization for an unconstitutional restriction of expressive conduct.

. Bowman has raised concerns regarding the distinction between University and Non-University Entities' speech on dead days. I disagree with the Court’s treatment of this argument insofar as the limitations on athletic contests and plant maintenance are highly distinguishable. Maintenance work is not a protected expressive activity. Limitations on athletic contests do limit speech, but it is unclear from our precedent whether such speech is actually deemed protected speech. In any event, the spaces in which the contests occur might not be considered either traditional public fora or unlimited designated public fora and the limitations imposed restrict both student and non-student speech. I further question the Court's speculation University Entities's expressive activities, which may include speech by individuals not associated with education, are more attuned to the needs of the University for quiet during the dead days than the public. Nevertheless, the differential treatment raised by Bowman does not serve to make the regulation improper under a traditional public forum analysis because it serves significant government interests and is narrowly tailored to those interests since it minimizes the distractions faced by students during exam period and leaves open ample other times during which expressive activities may occur. Further, such claims are more properly raised under the Equal Protection Clause than under the First Amendment. See Kokinda, 497 U.S. at 733, 110 S.Ct. 3115.