Argued and submitted October 23, reversed and remanded with instructions December 17, 1997

Tumasi ROSS,
by and through his guardians ad litem
Randle L. Ross and Sarah Ross,
*Appellant,*

*v.*

CITY OF EUGENE,
*Respondent,*

*and*

JOHN DOES 1-6,
Judy Rodenhuis and Thomas Schulke,
*Defendants.*

(16-95-10543; CA A95889 (Control))

Cochise MOORE,
by and through his guardians ad litem
Patricia S. Moore and Charles Dalton,
*Appellant,*

*v.*

CITY OF EUGENE,
*Respondent,*

*and*

JOHN DOES 1-6,
Judy Rodenhuis and Thomas Schulke,
*Defendants.*

(16-95-10542; CA A95890)
(Cases Consolidated)

950 P2d 372

Robert L. Ackerman argued the cause and filed the briefs for appellant.

James E. Mountain, Jr., argued the cause for respondent. On the brief were Jens Schmidt, Judith Giers and Harrang Long Gary Rudnick P.C.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LEESON, J.

## LEESON, J.

Plaintiffs Ross and Moore appeal from a judgment notwithstanding the verdict (judgment *n.o.v.*) entered in favor of defendant, City of Eugene, after a jury returned verdicts for them on their claims for false arrest. ORCP 63. A judgment *n.o.v.* is appropriate only when there is no evidence to support the verdict. *Whinston v. Kaiser Foundation Hospital*, 309 Or 350, 356 n 8, 788 P2d 428 (1990). Because the jury returned verdicts in favor of Ross and Moore, we view the evidence in the light most favorable to them and draw all reasonable inferences in their favor. *King v. All Pro Services, Inc.*, 120 Or App 479, 483, 852 P2d 943 (1993). We reverse and remand.

On April 28, 1995, at 3:47 p.m., a branch of U.S. Bank located at West 29th Street in Eugene was robbed by a man described as black, 35 years old, of medium build and approximately 5' 10" tall. He wore dark clothing, a black stocking cap and black glasses. His hair was pulled back into a ponytail, and he had tattoos on his hands and neck. The robber allegedly was armed and rode away from the bank on a bicycle.

Within the vicinity of the bank, and at about the same time, Ross was waiting for his friend, Moore, so that they could go to track practice together. Ross, who is black, was 15 years old, approximately 5' 8" tall, and weighed about 160 pounds. Ross was wearing a tan, red and teal jacket and green sweat pants. Ross' hair was not pulled back into a ponytail, he did not have tattoos on his hands or neck, and he was not wearing black glasses or a black stocking cap. Eugene Police Officer Brooks was patrolling the area in search of the bank robbery suspect when he saw Ross lying on the ground with his feet propped up on his bicycle. Brooks initially believed that Ross had been riding away from the bank on his bicycle and had crashed. Brooks called for a "cover car" on his patrol car radio. Eugene police officers Schulke and Rodenhuis testified that there was a sense of urgency in Brooks' tone of voice even though Brooks' call for cover did not otherwise indicate by the words spoken that his call for cover was urgent.

As Brooks approached Ross, Moore rode up on his bicycle. Moore also is black and was 16 years old, 6' 2" tall, and weighed approximately 150 pounds. Like Ross, Moore was dressed for track; his jacket was purple, blue and black. Moore's hair was not pulled back into a ponytail, he did not have tattoos on his hands or neck, and he was not wearing black glasses or a black stocking cap.

Brooks told Ross and Moore that a nearby bank had been robbed and that the suspect was a black man riding a bicycle. Brooks explained that Ross and Moore needed to remain where they were so that bank personnel could come by to confirm or deny their involvement in the robbery. Brooks told Moore to place his hands on the patrol car, and he told Ross to remain sitting on the street curb with his hands placed out in front of him. Both youths complied with Brooks' requests. Brooks patted them down before the other police officers arrived. Brooks then chatted with Ross and Moore about "track and different schools, who's going to win like the state championship." Brooks testified that to an outside observer, the situation was "very calm."

Schulke and Rodenhuis arrived simultaneously in separate patrol cars to provide cover for Brooks. Officers who provide cover are trained to make sure that the situation is "stabilized" by checking for weapons, neutralizing offensive movements towards the officers and preventing escape by the suspects. Schulke testified at trial that his function in providing cover includes keeping his eyes on and concentrating on the person on whom the other officer is not concentrating. Schulke testified that part of his function at the scene in this case was "just to let things calm down a second." He testified that he wanted to get both the suspects and the police officers calmed down.

Neither Schulke nor Rodenhuis spoke to Brooks before approaching Ross and Moore, and both officers immediately drew their guns as they approached. Schulke pointed his gun at Moore's back and again patted down Moore's outer clothing. Rodenhuis pointed her gun at Ross, and when a fourth officer arrived to "cover" her, she returned her gun to its holster, placed handcuffs on Ross, patted him down for weapons and then removed the handcuffs. The officers found

neither weapons nor large sums of money on either Ross or Moore. The officers permitted Moore to sit on the grass next to Ross while they waited for the arrival of bank personnel. The officers described the youths as "gentlemanly" and "polite." Although Ross and Moore never attempted to leave, it is undisputed that they were not free to leave, and Schulke and Rodenhuis testified that they would have forcibly detained them if they had tried to leave. Within a few minutes, a bank teller came to the scene and informed the police officers that neither Ross nor Moore was the bank robber. The youths then were allowed to leave, and they went to track practice.

On November 3, 1995, Ross and Moore filed these claims for false arrest, alleging that Schulke and Rodenhuis unlawfully confined them when they came on the scene to provide cover for Brooks.[1] The cases were consolidated for trial. Ross and Moore called Schulke and Rodenhuis as plaintiffs' witnesses. Both officers testified that they heard the description of the robbery suspect that was broadcast over the police radio and that they knew that the suspect was medium build, 5' 10" tall, was wearing a black stocking cap, black glasses and dark clothing, had tattoos on his hands and neck and had his hair pulled back into a ponytail. Schulke testified that he believed that the 6' 2" tall, 150-pound Moore was approximately 5' 10" tall with a medium build. Schulke also testified that Moore was not dressed as the robbery suspect was described and did not have tattoos or a ponytail. Rodenhuis testified that plaintiffs appeared to be "young twenties, twenty to twenty-five." She also testified that, with regard to Ross, she did not remember him wearing a black stocking cap, and she did not see any black glasses, but remembered that Ross was wearing "darker" clothing. Rodenhuis also testified that Ross had a small ink pen design on one of his hands.

Several police officers testified on behalf of defendant. Eugene Police Sergeant Thies, an instructor on the use

---

[1] Plaintiffs also filed claims for violations of their civil rights under 42 USC § 1983 against defendant City of Eugene and Eugene police officers Schulke and Rodenhuis. The jury returned a verdict in favor of defendants on the § 1983 claims, and plaintiffs did not appeal from the judgment entered on those claims.

of force at police academies, described proper police conduct in responding to a potentially dangerous situation in which a suspect allegedly is armed: The cover officer is to take control of the situation in order to provide safety to the other officer, any bystanders and the suspects. In Thies' opinion, Schulke and Rodenhuis acted "appropriate[ly]" and consistently with the training provided to City of Eugene police officers. Thies also testified that based on the description of the scene before Schulke and Rodenhuis arrived, Brooks "had the situation stabilized." Lieutenant Webb of the Oregon Board on Public Safety Standards and Training testified that in his opinion, "the officers conducted themselves in a manner that's consistent with the way they were trained and the standards that are consistent throughout the United States" and that he believed that the Schulke and Rodenhuis' conduct was "reasonable." Like Thies, Webb also testified that the scene "appear[ed] to be under control" before Schulke and Rodenhuis arrived.

At the close of plaintiffs' evidence, defendant moved for directed verdict, but the trial court denied that motion. At the close of all the evidence, defendant again moved for directed verdict. At plaintiffs' request, the case was tried to a jury. ORCP 63 B.[2] The jury returned verdicts in favor of plaintiffs on their false arrest claims, awarding each of them $10,000 in damages. Defendant moved for judgment *n.o.v.*, on the grounds that the evidence was insufficient to support the verdicts and that "[e]xpert testimony was necessary to support plaintiffs' cases because the appropriate conduct of a police officer during an encounter with a robbery suspect, reportedly armed with a gun, is not likely to be within the knowledge of the average juror." The trial court granted defendant's motion without explanation.

---

[2] The trial court neither denied nor granted defendant's second motion for directed verdict, but it suggested that it intended to grant the motion. However, the court allowed plaintiffs' request under ORCP 63 B, which provides:

"In any case where, in the opinion of the court, a motion for a directed verdict ought to be granted, it may nevertheless, at the request of the adverse party, submit the case to the jury with leave to the moving party to move for judgment in such party's favor if the verdict is otherwise than as would have been directed or if the jury cannot agree on a verdict."

The tort of false arrest contains four elements: (1) defendant must confine plaintiff; (2) defendant must intend to accomplish the act that causes confinement; (3) plaintiff must be aware of the confinement; and (4) the confinement must be unlawful. *Lukas v. J.C. Penney Co.*, 233 Or 345, 353, 378 P2d 717 (1963); *Walker v. City of Portland*, 71 Or App 693, 697, 693 P2d 1349 (1985). In an action for false arrest, the plaintiff has the burden to show the imprisonment. After that, the defendant has the burden of showing that the imprisonment was not unlawful. *Easton v. Hurita*, 290 Or 689, 691-92, 625 P2d 1290 (1981). Generally, the elements of false arrest are factual issues that are to be resolved by the trier of fact. *See O'Brien v. Eugene Chemical*, 63 Or App 284, 288, 664 P2d 1106 (1983) (whether elements of false arrest are satisfied is a factual question for the jury to decide). However, when the facts are not in dispute and there is only one reasonable inference to be drawn from the evidence, the trial court decides the issue. *See James v. Carnation Co.*, 278 Or 65, 69, 562 P2d 1192 (1977).

In this case, the parties frame the issue as one in which the *manner* of plaintiffs' detention determines the lawfulness of that detention. Without expressing an opinion on whether we think the parties have framed the test correctly, we address the argument as they have presented it: whether there is evidence from which the jury could find that Schulke and Rodenhuis unlawfully confined plaintiffs.[3] In their first assignment of error, plaintiffs contend that the trial court erred in granting defendant's motion for judgment *n.o.v.*, because the evidence at trial leads to more than one inference: A jury could find that Schulke and Rodenhuis lawfully confined Ross and Moore, or it could find that the officers unlawfully confined them. Plaintiffs also contend that there is evidence to support the jury's finding that Schulke and Rodenhuis acted unlawfully when they came on the scene to provide "cover" for Brooks. Defendant responds that there is only one inference to be drawn from the evidence, namely, that Schulke and Rodenhuis' conduct "was reasonable when considered in light of the totality of the circumstances."

---

[3] Plaintiffs concede that under the circumstances, Brooks had reasonable suspicion to stop them and to frisk them. ORS 131.615(1); ORS 131.625(1).

We agree with plaintiffs that more than one inference could be drawn from the facts adduced at trial. In the light of our obligation to view the evidence in the light most favorable to Ross and Moore, we conclude that the reasonableness of Schulke and Rodenhuis' conduct was a question for the jury to decide and that there is evidence to support the jury's finding that Schulke and Rodenhuis' confinement of Ross and Moore was unreasonable.

At trial, defendant's witnesses, Thies and Webb, testified that, by all accounts, Brooks appeared to have "the situation stabilized" and "under control" before Schulke and Rodenhuis arrived. Brooks described the plaintiffs as "very gentlemanly" and "polite" and testified that the scene was "very calm." Schulke and Rodenhuis knew the description of the robbery suspect before they arrived on the scene and knew that neither Ross nor Moore matched that description. Nonetheless, when they arrived, they drew their guns, pointed them at Ross and Moore's backs, frisked them again and placed Ross in handcuffs for a few minutes. From this evidence, the jury could conclude that Schulke and Rodenhuis did not act reasonably under the circumstances. It was the jury's province to weigh the evidence. *W.R. Chamberlin & Co. v. Northwestern Agencies*, 289 Or 201, 207, 611 P2d 652 (1980). Because the record contains evidence from which the jury could find that Schulke and Rodenhuis did not act reasonably under the circumstances, the trial court erred in granting defendant's motion for judgment *n.o.v.* on that ground.

Plaintiffs also assign error to the alternate ground on which defendant moved for judgment *n.o.v.*, namely, defendant's contention that plaintiffs were required to prove by expert testimony that Schulke and Rodenhuis' conduct was unlawful. Plaintiffs contend that "[t]he reasonableness of the officers' conduct is based on information that is within the knowledge of the average juror," but "[e]ven if expert testimony is required, the [d]efendant['s] expert witnesses each created questions for the jury * * *." Defendant argues that "the appropriate conduct of a police officer during an encounter with a robbery suspect, reportedly armed with a gun, is not likely to be within the knowledge of the average juror" and that the lack of expert testimony by plaintiffs regarding

the unreasonableness of the officers' conduct is an additional reason why the evidence was insufficient to support the jury's verdicts.

 Expert testimony is not essential when the issue presented relates to a matter that requires only common knowledge and experience to understand. *Lynd v. Rockwell Manufacturing*, 276 Or 341, 349, 554 P2d 1000 (1976). Expert testimony is required "only where the proof involves matters that cannot be fully understood by the average juror without some expert assistance." *Pacificorp v. Union Pacific Railroad*, 118 Or App 712, 715, 848 P2d 1249 (1993). Furthermore, expert testimony at trial does not define the standard of conduct for police officers in carrying out their official duties. *Gaffey v. Babb*, 50 Or App 617, 628, 624 P2d 616, *rev den* 291 Or 117 (1981). Although expert testimony may be helpful to a jury when police conduct is at issue, we find no authority, and defendant provides us with none, that requires a plaintiff in a false arrest case to provide expert testimony to establish whether police conduct was unreasonable.[4]

The trial court erred to the extent that it granted defendant's motion for judgment *n.o.v.* on the ground that plaintiffs were required to prove by expert testimony that Schulke and Rodenhuis' conduct was unlawful.

Reversed and remanded with instructions to enter judgment on the verdicts.

---

[4] As noted earlier, in a false arrest action the defendant bears the burden of proving that the plaintiff's confinement was not unlawful. *Easton v. Hurita*, 290 Or 689, 703, 625 P2d 1290 (1981). However, neither party raises this issue, and we resolve the assignment of error as framed by the parties.