**Michael John CARR, Plaintiff,**

v.

**CITY OF HILLSBORO, a municipal corporation; Hillsboro School District, 1J, Defendants.**

**Civil No. 06–6060–ST.**

United States District Court, D. Oregon.

July 9, 2007.

Daniel J. Stotter, Irving & Stotter LLP, Eugene, OR, for Plaintiff.

Robert S. Wagner, David C. Lewis, Miller & Wagner, LLP, Portland, OR, Rebekah R. Cook, Salem, OR, for Defendants.

ORDER

HAGGERTY, Chief Judge.

Magistrate Judge Stewart has issued a Findings and Recommendation [75] in this action recommending that plaintiff Michael John Carr's ("Carr" or "plaintiff") Motion for Summary Judgment [28] be denied, defendant City of Hillsboro's ("City") Motion for Summary Judgment [19] be grant-

ed, and defendant Hillsboro School District 1J's ("School District") Motion for Summary Judgment [27] be granted. Carr filed objections [77] to the Findings and Recommendation, and the matter was then referred to this court.

When a party objects to any portion of the Magistrate's Findings and Recommendation, the district court must make a *de novo* determination of that portion of the Magistrate's report. 28 U.S.C. § 636(b)(1)(B); *McDonnell Douglas Corp. v. Commodore Bus. Machines, Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981).

The objections were filed in a timely manner. The court has given this matter a *de novo* review, and has also carefully evaluated the Magistrate's Findings and Recommendations, the objections, and the entire record. Magistrate Judge Stewart provided a thorough analysis of the facts and circumstances regarding this litigation, and the analysis need not be repeated here. For the following reasons, the Findings and Recommendation is adopted.

## ANALYSIS

Plaintiff objects "on the grounds that the Findings and Recommendation did not correctly apply the legal standard of Fed. R. Civ Proc. 56, by improperly adopting findings in support of [defendants] as to factual issues where there is clearly a material dispute of fact in the record ..." Pl.'s. Objections at 1. Plaintiff contends that, based on the evidence provided, a dispute exists as to whether (1) he trespassed on school property and interfered with school related activities, (2) officers had probable cause to arrest him, (3) police and school officials had First Amendment training for purposes of establishing *Monell* entity liability, and (4) the School District should be jointly liable for his false arrest. These objections will be addressed in turn.

## 1. Trespass and Interference with School Related Activities

Plaintiff contends that the Findings and Recommendation erroneously found "that Plaintiff Carr had actually entered upon school property ..." and "had caused an interference with school related functions" by blocking students' access to school buses. Pl's Objections at 3. However, the Findings and Recommendation did not rely on Carr's alleged trespass in reaching its conclusion. Findings and Recommendation at 19 ("However, even assuming that Carr remained at all times on the public portion of the sidewalk adjoining the school, [Carr's constitutional] argument fails based on the record before this court."). Instead, the Findings and Recommendation found that Carr's actions on the public sidewalk caused a material disruption to normal school activities. Findings and Recommendation at 20. This court agrees.

Carr's contention that the Findings and Recommendation erred by finding that he blocked student access to school buses is misplaced. Under Local Rule 56.1(f), facts set forth in fact statements or responses thereto are deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party. The School District specifically alleged in its Concise Statement of Material Facts that "[t]he area where [Carr] was standing interfered with the flow of student traffic from the school to the buses, as he was standing in the bus loading zone." Def. Sch. Dist. Concise Statement Facts, ¶ 5. Plaintiff missed his opportunity to rebut that fact by failing to include within his own Concise Statement any allegations to the contrary. A careful reading of plaintiffs Concise Statement of Material Facts finds no refutation to the School District's claim that plaintiff was obstructing the egress and regress of stu-

dents. Therefore, this court adopts defendants' allegation that plaintiff disrupted the flow of student traffic from school to the buses waiting curbside.

■■■ This court agrees with the Findings and Recommendation that "[t]he First Amendment does not provide an unfettered right to conduct expressive activity in any forum under any circumstances." Findings and Recommendation at 20. The Supreme Court held that "expressive activity may be prohibited if it 'materially disrupts classwork or involves substantial disorder or invasion of the rights of others.'" *Grayned v. City of Rockford,* 408 U.S. 104, 118, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (citing *Tinker v. Des Moines Sch. Dist.,* 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)). Here, the undisputed facts indicate that plaintiff impaired students' progression to the buses, yelled at the school security guard in front of schoolchildren, frightened many students with his activity, and generally caused substantial disorder. The Findings and Recommendation relied upon these undisputed facts to reach the conclusion that Carr's First Amendment claim could not withstand summary judgment. After considering plaintiffs objections, this court now joins in that conclusion.

### 2. Probable Cause and False Imprisonment

■■ Plaintiff contends that the City's "alleged claims of probable cause for arresting [p]laintiff are supported only by unsupported suspicions, conjectures, and other misplaced fears by various officers and school officials...." Pl's Objections at 6. Plaintiff argues that because the police ultimately dropped the trespass charges against him and lacked any objective evidence that he had impeded the flow of student traffic, the City lacked probable cause for his detention.

Plaintiff, however, confuses the issue of probable cause with the issue of guilt beyond a reasonable doubt. The Findings and Recommendation correctly notes that "the issue is not whether Carr was convicted, but whether probable cause supported his arrest in the first instance." Findings and Recommendation at 19. Here, "the uncontradicted evidence is that police dispatchers relayed to the responding officers that school officials complained of a man dressed in full army camouflage gear who was standing on or near school property." Pl.'s Resp. Opposition Mot. Summ. J., Ex. I. It is undisputed that the principal of the school told an officer that Carr had been on school grounds and refused to leave when asked, and that Carr refused to answer the officer's questions, instead electing to turn his back on the officer and yell more loudly at the school children.

While plaintiff may now contest the accuracy of the eyewitness accounts, there is no dispute about the uncontradicted information those eyewitnesses conveyed to the police. Therefore, this court agrees with the factual findings of the Findings and Recommendation and concurs that those facts established probable cause to detain plaintiff.

### 3. *Monell* Entity Liability

■■ Plaintiff argues that the Findings and Recommendation "improperly rejected [p]laintiff's arguments as to evidence of a pattern and practice of improper civil rights training activity by both [the City and the School District]." Pl.'s Objections at 5. Plaintiff cites Ninth Circuit case law for the proposition that deliberate indifference to providing police officers with First Amendment training can constitute "custom or practice" for purposes of *Monell* entity liability. *Id.* However, plaintiff offers no evidence that demonstrates either deliberate indifference or a lack of training

on the part of the City or the School District.

Plaintiff argues that the deposition of Officer Ambrose indicates that the City "failed to provide any training whatsoever as to First Amendment rights and religious expression ... on the city sidewalks and other public [areas]." Pl.'s Objections at 5. Plaintiff apparently relies on Officer Ambrose's following statement: "I don't recall a specific class on First Amendment, you know, for one hour, Second Amendment for two hours." Pl.'s Resp. Opposition Mot. Summ. J., Ex. H. However, in the same deposition cited by plaintiff, Officer Ambrose was asked: "... [B]efore the arrest in 2004 of Mr. Carr, had you had any specific training—against, specific training to First Amendment expression or religious opinion, at that time?" Officer Ambrose responded, "[y]es ... [w]e did cover some of those." Pl.'s Resp. Opposition Mot. Summ. J., Ex. H. Thus, the very document raised by plaintiff stands in direct contradiction to his theory. Therefore, this court affirms the Findings and Recommendation, that "Carr has failed to garner sufficient evidence to proceed with a *Monell* claim." Findings and Recommendation at 15.

**4. School District's Joint Liability**

■ Plaintiff contends that the School District is jointly liable "for causing [p]laintiff's false arrest by instigating his imprisonment through false and misleading information which was presented to the [City] police department ..." Pl.'s Objections at 11. However, joint liability is inapplicable here because defendants have succeeded on their motions for summary judgment, and therefore, no primary liability exists. Furthermore, even if defendants were found liable, Oregon law cuts against plaintiff's argument:

> " 'Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. In

the case of an arrest, it is the equivalent, in words or conduct, of 'Officer, arrest that man!' It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them ...' "

*Pearson v. Galvin,* 253 Or. 331, 454 P.2d 638, 641 (1969) (quoting RESTATEMENT (SECOND) OF TORTS § 45A cmt. a). All evidence indicates that School District officials provided police with the information available at the time, and then left for the City the decision of how to resolve the situation. Therefore, plaintiffs joint liability claims fail to survive summary judgment.

**CONCLUSION**

For the reasons provided, the Magistrate Judge's Findings and Recommendation [75] is ADOPTED.

IT IS SO ORDERED.

FINDINGS AND
RECOMMENDATIONS

STEWART, United States Magistrate Judge.

**INTRODUCTION**

On March 19, 2004, plaintiff, Michael John Carr ("Carr"), was arrested in front of the J.B. Thomas Middle School, in Hillsboro, Oregon. On March 17, 2006, Carr filed this action, alleging two claims against defendants the City of Hillsboro ("City") and Hillsboro School District 1J ("School District"). In his First Claim, brought pursuant to 42 USC § 1983, Carr alleges that defendants violated his constitutional rights to free speech, to practice his religion, and to be free from unreasonable seizure of his person. In his Second Claim, Carr alleges that defendants jointly caused his false arrest. Carr requests preliminary and permanent injunctions

prohibiting defendants from excluding him from various public places in Hillsboro, $50,000.00 compensatory damages, costs and attorney fees.

This court has original jurisdiction under 28 USC § 1331 and supplemental jurisdiction under 28 USC § 1367.

All parties have now filed motions for summary judgment (City, docket # 19; School District, docket # 27; Carr, docket # 28). For the reasons set forth below, summary judgment should be granted in favor of the City and the School District.

## LEGAL STANDARD

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law." The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548,

citing FRCP 56(e). The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial." *Balint v. Carson City, Nev.*, 180 F.3d 1047, 1054 (9th Cir.1999) (citation omitted). A " 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' " does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id.* (citation omitted).

## FACTS

A review of the parties' facts,[1] as well as the other materials submitted by the parties, including affidavits, declarations, and deposition excerpts,[2] reveals the following:

---

1. This court waived the requirement for a Concise Statement of Material Facts supporting a motion for summary judgment under Local Rule 56.1(a)(2). Minute Order dated September 20, 2006 (docket # 13). Despite that waiver, all parties filed Concise Statements of Material Fact. *See* Concise Statement of Material Facts in Support of Defendant City of Hillsboro's Motion for Summary Judgment (docket # 20); Defendant School District's Concise Statement of Material Facts (Attachment # 2 to docket # 27); and Plaintiff's Concise Statement of Material Facts (docket # 30). Defendants responded to Carr's fact statement, but Carr did not respond to defendants' fact statements. City of Hillsboro's Response to Plaintiff's Concise Statement of Material Facts (docket # 46); Response of Defendant School District to Plaintiff's Concise Statement of Facts (Attachment # 2 to docket # 48). Under Local Rule 56.1(f), facts set forth in fact statements or responses thereto are deemed admitted unless

specifically denied or otherwise controverted by a separate concise statement of the opposing party.

2. Both parties have submitted documents with various attachments. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant or deponent, and citations are to the paragraph(s) of the affidavit or declaration or page(s) of the deposition transcript. Carr's exhibits were either conventionally filed or are attached to the Declaration of Daniel J. Stotter (docket # 39) and the Third Declaration of Counsel Daniel J. Stotter (docket # 68). The bulk of the School District's exhibits are attached to Defendant School District's Concise Statement of Material Facts (Attachment # 2 to docket # 27). References to those exhibits are to the exhibit number (School District's exhibits) or exhibit letter (Carr's exhibits). When affidavits and declarations are submit-

Carr believes he has a solemn religious obligation to spread the Gospel of Jesus Christ. Carr Decl, ¶ 2. In furtherance of that obligation, Carr engages in "open air preaching" on religious teachings and distributes educational religious literature, which he describes as "Christian comic booklets discussing various moral and religious themes." *Id;* Carr Depo, pp. 115–16. In the fall of 1997 or early 1998, Carr began engaging in his open air preaching at public middle and high schools in Hillsboro, Oregon. Carr Depo, p. 9. He has done this once or twice a year at most of those schools, but visits J.B. Thomas Middle School more regularly because of its convenient location on NE Lincoln Street between 6th and 8th Streets in Hillsboro. *Id* at 10–12.

On March 19, 2004, Carr approached J.B. Thomas Middle School ("the school") just as the students were being dismissed for the day and were boarding approximately ten busses parked in front of the main school entrance. *Id* at 22. Carr was dressed in full military fatigues and wearing a sandwich sign board that was a few inches wider than his body and extended from his breast bone down to an inch or two above his knees. *Id* at 17–18. His pockets were bulging with pamphlets bearing religious messages. He stood on the sidewalk in front of the school and began his preaching, loudly, albeit without amplification, "projecting [his] voice, in the form of a public speaker or performer, so that his words could be heard at this outdoor location." Carr Supp Decl, ¶ 8.

A concrete walkway connects the front of the school to a city sidewalk (which is in the public right-of-way), running perpendicular to the walkway. The edges of this walkway flare out prior to reaching the right-of-way line, creating a strip of concrete approximately eight feet wide on either side of the walkway where it adjoins

the city sidewalk. These adjoining concrete strips form a wider section of the "sidewalk," one side of which is within the public right-of-way and the other of which (approximately eight feet wide) is owned by the School District. *See* Filicky Decl, Ex A. A "clearly visible joint or seam" is formed along the right-of-way line where the city sidewalk abuts the strip of concrete owned by the School District. *Id.* at ¶ 6. No other physical feature indicates that the portion of the "sidewalk" on the school side of the joint or seam is owned by the School District.

"[A]lmost immediately," school security guard, James Rush ("Rush"), whom Carr knew was connected with the school, approached Carr and asked him to cross the street. Carr Depo, pp. 12, 19–23. Carr responded by saying "No, I'm not crossing the street. I'm on a public sidewalk," then turned and walked away from Rush. *Id.* at 23–24. During at least part of his conversation with Rush, Carr was on the portion of the "sidewalk" that is owned by the School District. Wagner Aff, Ex 3 (Rogers Depo), p. 3; Filicky Decl, ¶¶ 4–5 & Ex A; Overholt Suppl Decl, ¶ 3 & Ex A.

Rush then placed a radio call to the school's assistant principal, Rebecca Smith ("Smith"), telling her he had asked Carr to leave. Smith Depo, p. 60. Smith then approached Carr and also asked him to cross the street, telling him that he was on school property. Carr Depo, pp. 12, 28; Trial Transcript (Smith), p. 60. He responded that he was not on school property, was on a public sidewalk, and was not crossing the street. Carr Depo, p. 28. He then turned to the students, yelling that their administration or vice principal and their teachers wanted them to "burn in Hell." Trial Transcript (Smith), pp. 67–68. Some students ran back into the school building or ran up to Smith or other staff

ted as exhibits, the exhibit number or letter is provided with the first citation.

members and told them that Carr was frightening them, while other students "laughing and finding it humorous or entertaining" ran up to Carr to see what he was passing out. *Id.* at 68–69, 78–79.

Smith asked Carr to leave the school premises at least three times over a five to ten minute period, during which time Carr continued his loud remarks. *Id.* at 68, 70, 73. At that point, it was Smith's view that the "school premises" included the sidewalk because Carr was blocking students' path to busses. *Id.* at 73–74. Smith finally radioed the main office and asked them to call the police. *Id.* at 68, 70; Smith Depo (Carr Ex D), p. 39.

About five minutes later after all but three or four busses had driven away, Hillsboro police officers, including Melvin Ambrose ("Ambrose"), Megan Townsend ("Townsend"), and Wendy Overholt ("Overholt")[3] arrived. Trial Testimony (Smith), p. 68. When they were dispatched to the school, the officers were told that the principal wanted officers to respond as quickly as possible and a man with possible mental problems was on school property near the sidewalk, wearing full army camouflage gear. Ambrose Decl, ¶3.

When Ambrose arrived, he parked his car 150–200 feet away; when he got out of his car, he could hear Carr "basically yelling" his messages, including yelling "Choose Jesus. Go to Heaven," and another statement about gay marriage being wrong. Trial Transcript (Ambrose), pp. 26–27, 33–34. At that time, about 150 people were in the area. *Id.* at 43.

Ambrose contacted Rush, who told him that Carr had been on school property, but had refused to leave after having been asked to do so several times. Ambrose Decl, ¶6. Ambrose asked Carr what he

was doing and for identification. Carr Depo, p. 35. Carr refused to give his name or any identification to Ambrose and told him he was "exercising free speech." *Id* at 36–37. Carr then walked away from Ambrose, yelling louder than before. Ambrose Decl, ¶7; Overholt Decl, ¶5.

Ambrose spoke with Overholt who said that Rush had also told her that Carr had been on school property before the police arrived, but refused Rush's repeated requests to leave. Ambrose Decl, ¶8. Ambrose then went a distance away from Carr to speak with Smith. Carr Depo, p. 37. Smith told Ambrose that Carr was blocking students from going to the busses. Trial Testimony (Smith), p. 73. In response to inquiries by Ambrose, Smith told Ambrose that Carr had been on school property and that she wanted to press charges. Carr Depo, p. 38. At that point, Ambrose placed Carr in handcuffs and told him he was under arrest for the crime of Trespass II (ORS 164.245) *Id.;* Ambrose Aff, ¶9. Ambrose then turned Carr over to Townsend and continued his investigation. Ambrose Aff, ¶9.

During Ambrose's continuing investigation, either Rush or Smith, or both, told him that Carr had arrived just as the school day ended and students were leaving through the front doors, making their way toward 17 school busses parked at the front curb. *Id* at ¶10. Carr had positioned himself on the main sidewalk of the school leading to the front doors so that students had to walk around or by him to get to the busses; Carr's yelling had created a commotion which disturbed the students and delayed the departure of busses; Carr had refused to leave the property after several requests that he do so; and Carr got face-to-face with Rush and was

---

**3.** At that time, Overholt's last name was Ziervogel. Overholt Decl, ¶2. Since her submit-

tals are in her present name (Overholt), this court refers to her by that name.

yelling and screaming at him. *Id* at ¶ 10; Overholt Decl, ¶¶ 3–4.

Deputy District Attorney Kevin Kelley ("Kelley") independently determined that there was probable cause to prosecute Carr. Kelley filed a misdemeanor complaint against Carr in Washington County Circuit Court on December 6, 2004, charging him with two counts of disorderly conduct (one count regarding obstructing traffic and one count regarding noise) under ORS 166.025. Kelley Decl, ¶¶ 3–4 & Ex 1. On May 13, 2005, Washington County Circuit Court Judge Mark Gardner conducted a court trial regarding the charges against Carr. Plaintiff's Ex C. Carr was acquitted of both counts of disorderly conduct. Carr Decl, ¶ 8.

## *ANALYSIS*

### I. *Entity Liability—Claims Under § 1983*

In their motions regarding Carr's constitutionally-based claims, the parties discuss at length the parameters of Carr's rights under both the First and Fourth Amendment, specifically whether Carr's speech was protected, whether defendants had a significant government interest in preventing Carr's activities, and whether defendants' actions were narrowly tailored to advance their reported interest in protecting middle school students. However, Carr's claims are brought solely against two public entities, the City and the School District. The record reveals woefully inadequate evidence to support liability against these entities. For this reason, this court need not and does not reach the vast majority of the constitutional arguments raised in the briefing.

### A. *Legal Standard—Entity Liability*

█ In *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court decided that municipalities and oth-

er governmental bodies can be held liable under § 1983 when a municipal policy is the cause of an unconstitutional action taken by municipal employees. However, municipalities and other governmental bodies are "persons" subject to damages liability under § 1983 only where "action pursuant to official municipal policy of some nature cause[s] a constitutional tort." *Id* at 691, 98 S.Ct. 2018. In other words, a municipality cannot be held liable for the acts of its employees based solely on the doctrine of *respondeat superior. Id.* Instead, liability exists only where the unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by municipal officers, or where the constitutional deprivation is visited pursuant to governmental "custom" even though such a custom has not received formal approval. *Id.* at 690–91, 98 S.Ct. 2018.

█ In order to impose § 1983 liability against a governmental entity, including against a school district, a plaintiff must rely on one of three theories: "(1) that a[n] employee was acting pursuant to an expressly adopted official policy; (2) that a[n] employee was acting pursuant to a longstanding practice or custom; or (3) that a[n] employee was acting as a 'final policymaker.'" *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir.2004) (citation omitted). If relying on a "practice or custom," a plaintiff must demonstrate the existence of a "widespread custom of illegal and injurious discrimination." *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The practices of the government officials must be "so permanent and well-settled as to constitute a 'custom or usage' with the force of law." *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018. Proof of random acts or isolated events is insufficient to establish a custom. *Thompson v. City of*

*Los Angeles,* 885 F.2d 1439, 1444 (9th Cir. 1989). Governmental entities cannot be liable without more than one incidence of a constitutional violation of a non-policy maker. *Davis v. City of Ellensburg,* 869 F.2d 1230, 1234 (9th Cir.1989).

 An unconstitutional policy or custom need not be carried out by the municipality's official lawmakers to subject the municipality to liability. Liability may lie against a municipality for the conduct of those whose edicts or acts may fairly be said to represent official policy. *Pembaur v. Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Thus, where final policy-making authority is delegated to an official who then acts pursuant to that delegated authority in a way that causes a constitutional violation, the municipality will be liable for the resulting injury. *St. Louis v. Praprotnik,* 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Whether an official has final policy-making authority for purposes of § 1983 is a question for the court to decide, with reference to state or local law as appropriate. *Jett v. Dallas Indep. Sch Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

### B. *Analysis—Entity Liability*

 Carr does not allege that either the City or the School District expressly adopted an official policy that caused his arrest or that a City or School District employee was acting as a final policymaker. Thus, § 1983 liability against the City and the School District must rest on a custom or practice. Both defendants argue that Carr has failed to establish any custom or practice that caused his alleged injuries. This court agrees.

In support of his bid for entity liability against the City, Carr cites a letter that he allegedly sent to Ron Louie ("Louie"), the Chief of Police for the City of Hillsboro, on May 6, 2002. In that letter, sent nearly two years prior to the incident at issue in this case, Carr informed Louie that on May 2, 2002, three police officers (presumably from the City of Hillsboro Police Department), approached him while he was standing on a public sidewalk in front of the Poynter Middle School (presumably in Hillsboro), "wearing a small sign board and passing out free literature to interested students." Plaintiff's Ex. F, p. 1. He informed Louie that the officers objected to Carr tape recording their conversation, even after they were "specifically informed" that he would be doing so, and objected to the officers having asked him for identification. *Id* at 1–2. He also told Louie that Hillsboro police officers had asked him for identification "at least five times or more before Thursday May 2nd, for the past seven years," in contrast to "other cities and towns [which] do not bother to send police cars" and whose officers "[o]ften … may drive by to observe what I am doing and keep on driving." *Id* at 2–3. He concludes by "politely requesting [that Louie] train the daytime and afternoon policemen concerning the legal right of a citizen to tape record a police officer after being 'specifically informed'" and advising Louie that his "free speech activity should be well known in the City of Hillsboro by now" and that if "these events I have outlined occur again, I plan to take legal action." *Id* at 3.

Similarly, with respect to the School District's liability, Carr cites a letter he allegedly sent to Mario Alba ("Alba"), the principal of J.B. Thomas Junior High School, dated November 17, 1999. Plaintiff's Ex G. In that letter, sent over four years prior to the incident at issue in this case, Carr describes his visit (his sixth such visit in two years) to the public sidewalk in front of the school on that date. The letter notes that Carr never approached students and that students were

free to walk up to him or pass him by. *Id* at 1. Alba apparently asked Carr to move to the end of the sidewalk (which Carr refused to do), asked Carr his name (which Carr refused to give), and told him that he was scaring the students (which Carr denied). *Id* at 1–2. The letter then claims that Carr's "free speech activity is 100% perfectly legal," and declares as "illegal ... [Alba's] bullying tactics [and the actions of another school employee] who snatched the literature right out of the hand of a student who freely asked for the information." *Id* at 3. It concludes by encouraging Alba to contact the City of Hillsboro's attorneys, the Superintendent of Schools, and City of Hillsboro City Hall "to determine who has jurisdiction over the *public* sidewalk in front of the school." *Id* (emphasis in original).

Defendants's request to strike both of these exhibits for a variety of reasons is denied, although admission into evidence is limited to establishing notice. However, even if admitted for all purposes, the letters are patently insufficient to support entity liability against either the City or the School District. At best, the letters describe Carr's version of two previous encounters with police in front of two Hillsboro middle schools (one at J.B. Thomas Middle School) which resulted in Carr being asked for identification and being asked to move down the sidewalk, but being issued no tickets and not being arrested. The letters neither demonstrate any officially adopted City or School District policy nor any unconstitutional conduct by City or School District employees. Instead, the letters simply state, in rather disputatious terms, Carr's opinions about his rights to roam what he deems to be public sidewalks, to tape record conversations with City and School District employees, and to hand out free literature to students.

Carr implies that the number of times the same response has followed his preaching activities (*i.e.* school officials first asking him to move or identify himself, then calling police officers who also ask him to move or identify himself) constitutes evidence of a custom or practice sufficient to support a *Monell* claim. However, nothing in these documents indicates a custom or practice of unconstitutional conduct. Carr testified that during his ten year history of preaching activities at Hillsboro schools, he has been contacted—but not arrested—by Hillsboro police officers between five and ten times. Carr Depo, p. 121. An additional five to ten times, police cars have driven by and the officers have not contacted Carr at all. *Id.* Despite multiple contacts between Carr and School District officials and/or police officers during the six years of Carr's open air preaching outside Hillsboro schools, Carr was never arrested except on the single occasion at issue here. Moreover, Carr's own letter notes that at the time of the 1999 incident, Alba told Carr he was "scaring" the students, a contention echoed by Smith in her trial testimony in this case. Carr has neither refuted this testimony nor the testimony that Smith told Ambrose that Carr's conduct was frightening students. It is patently not unconstitutional for a school official concerned for the safety of students to contact the police and not unconstitutional for officers who have these same concerns to investigate.

In response to defendants' arguments regarding lack of evidence to support entity liability, Carr also argues that the letters to Louie and Alba and the "admission" of Ambrose that Carr never ventured from the public sidewalk onto school property, combined with the fact that Carr was nevertheless arrested, supports a "custom or practice" of providing insufficient training as to First Amendment and public

forum issues. This argument suffers from several flaws.

First, the record reveals that Carr's contention that Ambrose admitted that he never ventured onto school property is inaccurate. Ambrose testified that, during the time he was at the school, Carr never crossed the plane formed by an imaginary line extending across the concrete parallel to the school equidistant with the grass. Trial Testimony (Ambrose), pp. 54–55. Thus, that testimony is limited to that period of time after Ambrose arrived on the scene. However, the dispatcher told responding police officers before Ambrose arrived at the school that the suspect was "standing just on the school's property by the sidewalk" (Plaintiff's Ex I) and the survey submitted by defendants indicates that a portion of the sidewalk which Carr assumes is "public" is in fact on School District property. Filicky Decl, ¶¶ 4–5 and Ex A.

Second, even if Carr was never on school property, the present pleadings do not allege a claim based on a failure to train.

▆▆▆▆ Third, assuming such a claim were alleged, Carr has failed to submit evidence to support such a theory. A claim of failure to train requires the plaintiff to show that the failure to provide adequate training or supervision amounts to a policy or custom evidencing a deliberate indifference to the rights of persons with whom the police come into contact. See City of Canton, Ohio v. Harris, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); see also Merritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989). This would require Carr to "establish a program-wide inadequacy in training." Alexander v. City and County of San Francisco, 29 F.3d 1355, 1367 (9th Cir.1994), cert denied, 513 U.S. 1083, 115 S.Ct. 735, 130 L.Ed.2d 638 (1995). He cannot simply allege a specific type of training that he believes the officers should have had.

That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. It may be, for example, that an otherwise sound program has occasionally been negligently administered. Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situation with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact they do says little about the training program or the legal basis for holding the city liable. City of Canton, 489 U.S. at 390–91, 109 S.Ct. 1197 (citations omitted); see also Ting v. United States, 927 F.2d 1504, 1512 (9th Cir.1991) ("the fact that the agents may not have been trained in every conceivable hostile arrest scenario ... would not render the training inadequate.").

At best, Carr has identified a specific type of training he believes City and School District officials should have had. He offers no evidence, by way of an expert opinion or otherwise, that the training program of the City or the School District is inadequate. Instead, he simply cites the fact of his own arrest to support that contention. This will not carry the day for purposes of a claim based on a failure to train.

▆▆▆▆ Furthermore, a plaintiff must also show that the inadequate training program "actually caused" the constitutional viola-

tion. *City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197. Courts must ask: "Would the injury have been avoided had the employee been trained under a program that was not deficient in that respect?" *Id.* Carr has failed to offer any evidence answering that question in his favor. To the contrary, as discussed below, the record reveals that his arrest was based upon probable cause that Carr trespassed on School District property, and his further detention was based on probable cause that he had committed the crime of disorderly conduct in violation of Oregon law. Thus, the record does not support the conclusion that Carr would not have been arrested even had City and School District officials received different or further training on First Amendment and public forum issues.

In short, Carr has failed to garner sufficient evidence to proceed with a *Monell* claim against either the City or the School District. Accordingly, Carr's § 1983 claim against the City and the School District should be dismissed for this reason, and this court need not and does not address the remaining arguments with regard to those claims. Instead, this court turns to Carr's remaining claim for false arrest.

## II. *State Law Claim for False Arrest*

Carr contends that defendants jointly caused him to be unlawfully arrested and confined. Based on that joint conduct, he brings a supplemental state law claim for false arrest under 28 USC § 1367(a). Based on the undisputed facts of this case and reasonable inferences to be drawn from those facts, this court concludes that Ambrose had probable cause to take Carr into and keep him in custody.

### A. *Legal Standard—Arrest Must be Supported by Probable Cause*

In Oregon, false arrest and false imprisonment do not constitute separate tort claims. *See Hiber v. Creditors Collection Serv., Inc.,* 154 Or.App. 408, 413, 961 P.2d 898, 901, *rev denied,* 327 Or. 621, 971 P.2d 413 (1998) (citation omitted) (recognizing that in Oregon, an action for false imprisonment is also called false arrest). The gravamen of a false imprisonment or false arrest claim is "the unlawful imposition of restraint on another's freedom of movement." *Buckel v. Nunn,* 133 Or.App. 399, 405, 891 P.2d 16, 21 (1995), quoting *Walker v. City of Portland,* 71 Or.App. 693, 697, 693 P.2d 1349 (1985). Both torts require proof of four elements: "(1) defendant must confine plaintiff; (2) defendant must intend the act that causes the confinement; (3) plaintiff must be aware of the confinement; and (4) the confinement must be unlawful." *Hiber* 154 Or.App. at 413, 961 P.2d at 901 (citations omitted) (false imprisonment); *Ross v. City of Eugene,* 151 Or.App. 656, 663, 950 P.2d 372, 375 (1997) (false arrest). The defendant "must only intend to accomplish the act that causes confinement; they need not intend the confinement to be unlawful." *Oviatt By and Through Waugh v. Pearce,* 954 F.2d 1470, 1479 (9th Cir.1992) (interpreting Oregon law).

In an action for false arrest or false imprisonment, the plaintiff has the burden to show the imprisonment. *Ross,* 151 Or.App. at 663, 950 P.2d at 375. The burden then shifts to the defendant to show that the imprisonment was not unlawful. *Id.* (citation omitted). In Oregon, an officer has probable cause to arrest if "there is a substantial objective basis for believing that more likely than not an offense has been committed and a person to be arrested has committed it." *See State v. Makuch,* 340 Or. 658, 667, 136 P.3d 35, 40 (2006), citing ORS 131.005(11). "[W]here the material, historical facts are not in dispute, and the only disputes involve what inferences properly may be drawn from those historical facts, it is appropriate for this court to decide wheth-

er probable cause existed...." *Peng v. Mei Chin Penghu,* 335 F.3d 970, 979–80 (9th Cir.2003), *cert. denied,* 540 U.S. 1218, 124 S.Ct. 1506, 158 L.Ed.2d 153 (2004).

### B. *Analysis—State Law Claim for False Arrest*

Carr contends that his arrest and confinement without probable cause constituted false arrest. While there is no dispute that he was arrested and confined, defendants contend that Carr has failed to show a genuine issue of material fact as to whether the confinement was unlawful. ORS 133.310(1) authorizes a peace officer to "arrest a person without a warrant if the officer has probable cause to believe that the person has committed ... (b) A misdemeanor."

A person commits the crime of criminal trespass in the second degree if he or she "enters or remains unlawfully ... in or upon premises." ORS 164.245(1). A person commits the crime of disorderly conduct in the second degree if he or she intends to create or recklessly creates a risk of public inconvenience, annoyance or alarm by: "(a) Engag[ing] in fighting or in violent, tumultuous or threatening behavior; (b) Mak[ing] unreasonable noise; (c) Disturb[ing] any lawful assembly of persons without lawful authority; [or] (d) Obstruct[ing] vehicular or pedestrian traffic on a public way." ORS 166.025(1)(a)-(d). Both criminal trespass in the second degree and disorderly conduct in the second degree are misdemeanors. ORS 164.245(2) (criminal trespass in the second degree is a Class C misdemeanor); ORS 166.025(2) (disorderly conduct in the second degree is a Class B misdemeanor).

It is undisputed that dispatch relayed to the responding officers that a man with possible mental problems was on school property near the sidewalk wearing full army camouflage gear. It is also undisputed that Smith told Ambrose that Carr had been on and refused to leave school property and that she wanted to press charges. Finally, it is undisputed that Overholt told Ambrose that, according to Rush, Carr had been on school property and refused to leave despite repeated requests that he do so. The only reasonable inference that can be drawn from this evidence is that Ambrose initially had probable cause to arrest Carr for criminal trespass, thus obviating this initial arrest as a basis for a false arrest claim.

Carr acknowledges that Ambrose may have had some initial concerns about the possibility of a school shooting based on his choice of attire, bulging pockets, and large religious sign board which made it impossible to tell whether he had weapons. He also concedes that "there was apparently some initial confusion as to whether [he] had 'trespassed' onto school property." Plaintiff's Response to City of Hillsboro's Motion for Summary Judgment, p. 5. However, Carr argues that all of those concerns should have been allayed by Ambrose's further investigation.

Carr was not charged with criminal trespass as a result of this March 19, 2004 encounter at J.B. Thomas Middle School,[4] which lends some credence to his theory that Ambrose determined that there was no factual basis for this charge. Thus, Carr's false arrest claim turns on whether there was probable cause to keep him in

---

4. As a result of another incident at the same school nearly one year later on March 10, 2005, Carr was convicted on June 3, 2005, of Criminal Trespass 2, and sentenced to five years of bench probation. Defs' Ex. 7. As part of that probation, the court ordered that Carr "not be on [the] North sidewalk of Lincoln Street between 6th Ave and 8th Ave in Hillsboro." *Id.* The parties advise that an appeal of that ruling is pending before the Oregon Court of Appeals.

custody on some other basis once the underlying predicate for the criminal trespass charge (that he had been on school property) was discovered to be inaccurate. Defendants contend that Carr was properly held in custody because there was probable cause to arrest him for disorderly conduct in the second degree.

The undisputed evidence is that after Ambrose placed Carr in handcuffs and continued his investigation, Rush and Smith, or both, told him that Carr had positioned himself between the front school door so that students had to make their way around him in order to get to the busses that were parked at the front curb and that Carr's yelling had created a commotion which disturbed the students and delayed the departure of busses. They also told Ambrose that, in response to Rush's request that Carr leave that location, Carr got face-to-face with Rush and was yelling and screaming at him. Previous to that, Carr had flatly refused Ambrose's request that he identify himself, telling Ambrose that he was "exercising free speech," then walking away from Ambrose, yelling more loudly than before. The only reasonable inference that can be drawn from this evidence is that Ambrose's continued detention of Carr was supported by probable cause that he committed the crime of disorderly conduct in the second degree, thus obviating this remaining detention as a basis for a false arrest claim.

Carr counters that he was acquitted of both counts of disorderly conduct with which he was charged. However, probable cause to arrest for any crime is a complete defense to a common law action for false arrest. *Bacon v. City of Tigard,* 81 Or. App. 147, 149–50, 724 P.2d 885, 886 (1986). Thus, the issue is not whether Carr was convicted, but whether probable cause supported his arrest in the first instance. As discussed above, the only reasonable infer-

ence from the undisputed evidence is that probable cause existed to believe Carr had committed the crime of disorderly conduct in the second degree.

Carr insists that his conduct was constitutionally protected because he was simply expressing his religious beliefs on a public sidewalk, a classic First Amendment activity in a traditional public forum. However, even assuming that Carr remained at all times on the public portion of the sidewalk adjoining the school, that argument fails based on the record before this court.

The First Amendment does not provide an unfettered right to conduct expressive activities in any forum under any circumstances. In the context of public sidewalks adjoining school property, expressive activity which causes a material disruption to normal school activities may be curtailed without running afoul of the First Amendment. *Grayned v. City of Rockford,* 408 U.S. 104, 118–19, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Disruptions "immediately after school can affect the school's learning environment and [therefore] leaving school can properly be considered a 'normal school activity' for a junior high school." *PeTA, People for the Ethical Treatment of Animals v. Rasmussen,* 298 F.3d 1198, 1205 (10th Cir.2002). Here, the undisputed evidence is that Carr's conduct of positioning himself between the school doors and the busses delayed the departure of several busses and that his conduct caused a commotion, frightening some students and causing others to become distracted from getting either onto busses or otherwise on their way home. Carr cannot shield this disturbance to normal school activities from the criminal consequences it supports by waving the First Amendment flag. He, therefore, has no constitutional basis on which to undercut the probable cause determination supporting his arrest.

Carr's state law claim for false arrest fails because his conduct is not shielded by the First Amendment, and the undisputed facts show that Ambrose's continued detention of Carr was supported by probable cause to believe Carr had committed the crime of disorderly conduct in the second degree. Therefore, defendants should be granted summary judgment against Carr's state law false arrest claim

## RECOMMENDATIONS

For the reasons set forth above, both motions for summary judgment by the City (docket # 19) and the School District (docket # 27) should be GRANTED and Carr's Motion for Partial Summary Judgment (docket # 28) should be DENIED. As a result, a judgment should be entered dismissing this case with prejudice.

## SCHEDULING ORDER

Objections to the Findings and Recommendations, if any, are due April 5, 2007. If objections are filed, then the Findings and Recommendations will be referred to a district judge and go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will be referred to a district judge and go under advisement.

March 19, 2007.